[Civ. No. 22735. First Dist., Div. Two. Mar. 21, 1966.]

LESTER HINGSBERGEN, Plaintiff and Respondent, v. STATE PERSONNEL BOARD, Defendant and Appellant.

Thomas C. Lynch, Attorney General, E. G. Funke, Assistant Attorney General, Wiley W. Manuel and Leonard M. Sperry, Jr., Deputy Attorneys General, for Defendant and Appellant.

James Martin MacInnis for Plaintiff and Respondent.

AGEE, J.—The State Personnel Board appeals from the judgment of the superior court ordering the issuance of a peremptory writ of mandate requiring the board to set aside its decision dismissing respondent from his civil service position in the Department of Motor Vehicles, sometimes referred to herein as DMV.

Respondent was employed by the department from January 18, 1932 to June 26, 1963. On the latter date he was served with a preliminary notice of punitive action of dismissal. (Gov. Code, § 19574.) His position was then that of assistant chief special investigator.

Thereafter, respondent was charged with 12 specifications of misconduct. After a hearing before the hearing officer appointed by the board, specifications numbered 1, 3, 5, 6, 7 and 8 were found to be true. Only these are discussed below. The other six specifications were found to be not true, not established, insufficient to warrant disciplinary action, or barred by the statute of limitations.

The board adopted the hearing officer's findings of fact and proposed decision and ordered that the department's punitive action be sustained.

Following its review of the same record, the superior court made findings of fact contrary to the board's findings as to *each* of the six specifications which the board had found to be true.

In our opinion the superior court misunderstood its province. ▮ As we recently pointed out to the same court in *Neely* v. *California State Personnel Board,* 237 Cal.App.2d 487, 488-489 [47 Cal.Rptr. 64], the board is created and established by article XXIV of the California Constitution and derives its jurisdiction and adjudicating power therefrom. (*Boren* v. *State Personnel Board,* 37 Cal.2d 634, 638 [234 P.2d 981].) ▮ Its factual determinations must be upheld if they are supported by substantial evidence. (*Shepherd* v. *State Personnel Board,* 48 Cal.2d 41, 46 [307 P.2d 4].) Thus, the superior court in this proceeding should act as a reviewing court, not as a trial court. (*Neely* v. *California State Personnel Board, supra,* p. 489.)

▮ Our function here is the same as that of the superior court, namely, to determine whether the findings of the board are supported by substantial evidence. In making such determination we must regard the evidence in the light most favorable to the findings of fact made *by the board,* not those made by the superior court, and all legitimate and reasonable infer-

ences must be drawn in their support. (*Neely* v. *California State Personnel Board, supra,* 237 Cal.App.2d 487, 489; *Lorimore* v. *State Personnel Board,* 232 Cal.App.2d 183, 186 [42 Cal.Rptr. 640].)

It is thus apparent that the scope of judicial review of the board's factual determinations is circumscribed by the foregoing principles.

 *Specification number 1* charges "willful disobedience," a violation of Government Code section 19572, subdivision (o). The first paragraph of the board's findings with respect to this specification follows generally the language of the charge. We set it forth in full.

"1. Early in June, 1963, appellant [respondent herein] was ordered by his superiors to cooperate with the Attorney General's Office and with the Los Angeles District Attorney's Office in an investigation into alleged irregularities within the Department of Motor Vehicles. On June 26, 1963, appellant went to the office of Deputy Attorney General Goertzen in Los Angeles to keep an appointment to answer questions. Appellant was accompanied by John L. Brennan, an associate of the attorney who was then representing him. Goertzen informed appellant and his attorney that the statement was to be taken in the office of Los Angeles Deputy District Attorney Fuchs and the parties proceeded to Fuchs's office in the Los Angeles Hall of Justice. At the District Attorney's Office Fuchs, Goertzen and Brennan, in the presence of appellant, had an extended discussion regarding the procedure to be followed in questioning appellant. A stenographic reporter employed by the Los Angeles District Attorney was present to record the proceedings. Appellant's attorney insisted that the reporting be done by an 'official court reporter' or that appellant be permitted to record the interview on a tape recorder he had brought along. Brennan also stated that appellant would answer questions of Deputy District Attorney Fuchs only insofar as such questions would 'pertain to activities conducted in the County of Los Angeles' and that questions asked by Fuchs would be answered only in the District Attorney's Office located in the Hall of Justice, while questions asked by Deputy Attorney General Goertzen would be answered only in the Attorney General's Office in the State Building. When Goertzen and Fuchs refused to comply with these conditions, appellant was sworn but, on advice of his attorney, refused to answer any questions and left the room."

Respondent contends that the evidence is insufficient to support that portion of the above findings which we have underlined. This contention is without merit.

Deputy District Attorney Fuchs testified that respondent's attorney, Mr. Brennan, stated at the outset of the meeting that Fuchs would have to confine himself to questions about acts that took place in Los Angeles County and that such questions would have to be asked there in the district attorney's office; that Deputy Attorney General Goertzen could ask questions about anything he wanted to but that his questions would have to be asked in the Attorney General's office, some 2 blocks away.

Goertzen testified to the same effect. He told Brennan that such a condition "was completely impractical and uncalled for." He further advised Brennan that "the Attorney General's office was working in conjunction with the District Attorney's office"; that "the Attorney General's office was regarded as the chief law enforcement office" and "would be entitled normally to avail ourselves of participation by a District Attorney anywhere in the State"; that "I had been in the case since May and Mr. Fuchs had participated at some greater length and I desired to avail myself of Mr. Fuchs' Department and knowledge at that time so that I felt I would like Mr. Fuchs to participate across the board as well as myself, and he [Brennan] indicated that he did not like this, in other words, that he still wanted to press for the condition of separate participation."

Despite the foregoing testimony, respondent states in his brief on appeal that he "attempted to exact only *one* requirement: That an official court reporter transcribe the entire course of the meeting, or, in the alternative, that he be permitted to use a standard tape recorder which he had brought with him as a safeguard." The statement that respondent exacted only one requirement is contrary to the record.

The testimony is that there had been an hour-long discussion between Brennan, Fuchs and Goertzen before any of the proceedings were recorded. It was during this unrecorded period that Brennan laid down the conditions under which he would permit respondent to answer any questions.

When it became evident that no agreement could be reached, Fuchs announced "On the record" and proceeded to go through the formality of advising respondent of his constitutional rights and privileges and having him take the usual witness-oath.

Then ensued a short discussion "for the record." Mr. Brennan stated that, provided an official court reporter was supplied or a tape recording was permitted, respondent was "willing to answer any and all questions propounded by Mr. Fuchs that pertain to activities conducted *in the County of Los Angeles*" and that he was "further willing to answer any and all questions . . . when such questions are propounded by Mr. Goertzen of the Attorney General's Office." (Italics added.)

Goertzen replied as follows: "It is my wish as a deputy attorney general in this matter, assigned by Attorney General Mosk under his investigative powers, to utilize, as I have in the past, the office and facilities of the Los Angeles County District Attorney's Office, and also the services of David Fuchs, to transcend across the board any and all matters that our office is seeking to establish or uncover in this investigation, and that we wish to do it here in the Hall of Records—Hall of Justice in David Fuchs' Office in the District Attorney's Office. . . .

"What I would like the record to show is that, in effect, what Mr. Brennan desires is Mr. Fuchs to ask certain questions, myself to ask certain questions; and when Mr. Fuchs asks them, we stay here in the Hall of Justice; when I ask them, we are supposed to go down to the Attorney General's Office. That, practically speaking, this is completely unworkable; . . ."

Brennan did not in any way question the accuracy of this statement nor voice any contradiction thereto. Even without the direct testimony given by Goertzen and Fuchs at the hearing below, the above colloquy clearly shows that respondent was in fact insisting upon the condition as stated by Goertzen. The record further shows that respondent did not at any time withdraw said condition.

We turn now to a consideration of whether respondent was justified in refusing to answer any questions unless the conditions he imposed were complied with. We note preliminarily that respondent possessed peace officer powers under Vehicle Code section 1655 and that his duties as such necessarily involved uncovering and ascertaining violations of law.

As we have seen, respondent was ordered by his superiors to cooperate with the Attorney General of California and the District Attorney of Los Angeles County in their joint investigation of alleged irregularities in his own department. He complied with these orders only to the extent of appearing in

Los Angeles to be interviewed and not unconditionally refusing to answer any and all questions. However, the conditions which he imposed achieved the same result.

Refusing to answer any questions by Fuchs unless asked in the district attorney's office and refusing to answer any questions by Goertzen unless asked in the Attorney General's office is obviously a tactic deliberately designed to impede the investigation and frustrate the obtaining of any useful information.

In considering this aspect, the board's decision states: "It is difficult to imagine how such moving about could be of benefit to appellant [respondent herein] other than as it might impede the investigation." The board further expressed its opinion as follows: "The demands that limitations be placed on the questions to be asked by Fuchs and on the location where Goertzen or Fuchs could ask questions were nothing more than an attempt to create an additional excuse for refusing to cooperate in the investigation."

Implicit in the additional condition, that respondent would not answer any questions by Fuchs unless they pertained to Los Angeles County activities, is that respondent's attorney would be the sole arbiter of whether this geographical requirement was met. Respondent emphasizes that he acted as he did under advice of counsel and it is clear from the record that respondent had no intention of answering any question as to which his attorney voiced an objection.

The opportunities for the making of such objections were, of course, unlimited. It will become apparent from our discussion of the other misconduct specifications found to be true that almost all of respondent's improper activities occurred in northern California. With the interview in Fuchs's office limited to questions by him pertaining only to Los Angeles County activities, it is not difficult to foresee that many questions might be asked but few would be answered, at least not in his office.

We are in entire agreement with the following language contained in the board's decision: "Appellant [respondent herein] in effect contends that the conditions placed on the interrogation were those his attorney felt were necessary and that appellant was merely following the advice of his attorney in refusing to cooperate.[1] However, appellant had a right to disobey the orders of his superiors and refuse to

---

[1] This same contention was rejected in *DeGuire* v. *Police Commission*, 33 Cal.App.2d 576 [92 P.2d 423].

answer questions only if there was in fact some valid reason which would excuse his disobedience. It is recognized that this can put a state employee in the difficult position of deciding whether to follow the advice of his attorney or subject himself to disciplinary action for willful disobedience of the orders of his superiors. But to hold otherwise would mean that a state employee under investigation could hire an attorney and then refuse to answer questions until all conditions his attorney chose to impose are satisfied. The evil of such a situation is apparent in the present case. By his refusal to answer questions on June 26, 1963, appellant effectively eliminated himself as a source of information in the then pending Department of Motor Vehicles investigation. We are concerned here only with appellant's rights and obligations in an employer-employee relationship. It could well be that it was in appellant's best interest to follow his attorney's advice and refuse to answer questions. But whatever appellant's rights may be as a private citizen, he must, as a state employee, obey orders to cooperate in an investigation of a state agency or be subject to disciplinary action.''

The board recognized respondent's concern that he might be charged with perjury by the Los Angeles County grand jury, based upon any testimony that he might give at the interview in question.

It answers this point in its decision as follows: ''Any time a statement is given under oath, the possibility exists that perjury will be charged. This possibility does not give a state employee the right, unless the recording procedure is satisfactory to him, to disobey orders to give a sworn statement to a proper investigating jury, committee or agency. While appellant may have believed that the Grand Jury was trying to get him on a perjury charge, it is found that appellant did not believe that the Deputy Attorney General, the Deputy District Attorney and the reporter involved were going to alter the record of the proceedings so as to falsely charge him with perjury. Appellant did not refuse to answer questions because of dissatisfaction with the reporting arrangements but refused because he had no intention of giving any information to his interrogators. It should be noted that at no time on June 26, 1963, did appellant or his attorney mention their fear that the Grand Jury was out to get appellant on a perjury charge.''

There is no real dispute as to the law applicable to the specification of misconduct discussed above. Former Chief Justice Gibson stated it succinctly: ''A public employee, of

course, cannot be forced to give an answer which may tend to incriminate him, but he may be required to choose between disclosing information and losing his employment.'' (*Steinmetz* v. *California State Board of Education*, 44 Cal.2d 816, 824-825 [285 P.2d 617]; see *Christal* v. *Police Commission*, 33 Cal.App.2d 564 [92 P.2d 416], for full discussion of police officer's duty to disclose.)

Respondent herein does not question the propriety or reasonableness of the order of his superiors to ''cooperate with the Attorney General's Office and with the Los Angeles District Attorney's Office in an investigation into alleged irregularities within the Department of Motor Vehicles.'' (Cf. *Frazee* v. *Civil Service Board*, 170 Cal.App.2d 333 [338 P.2d 943], and *Fichera* v. *State Personnel Board*, 217 Cal.App.2d 613 [32 Cal.Rptr. 159], upholding discharge of police officers for refusal to obey orders of superiors to take lie detector test.)

Nor does respondent question that an *unconditional* refusal to answer questions put to him concerning the above-specified subject matter by either Fuchs or Goertzen would constitute ''willful disobedience'' of that order and thus be a proper cause for disciplinary action. (Gov. Code, § 19572, subd. (o).) Respondent's contention is that his *conditional* refusal did not violate said statute.

He cites and relies upon *Garvin* v. *Chambers*, 195 Cal. 212 [232 P. 696]. In that case, Garvin had been charged with the commission of a crime and was thereupon suspended from his position as a police officer. During the period of his suspension his superior officer demanded that he, Garvin, give an oral statement relative to the charge against him. Garvin refused to do so *unless his attorney was present*. Garvin was discharged for disobedience of the order. The court held the discharge to be invalid, stating that ''*while the order of indefinite suspension was in force* Garvin's status as a policeman was suspended to the extent that *he could not be called upon to do police duty nor be held amenable for a failure to do such duty.*'' (Italics ours.)

In the instant case respondent was on active duty and his attendance at the interview was a part of such duty. Furthermore, he was permitted to have his attorney present.

The crucial issue here is whether there is substantial evidence to support the appellant board's finding that the conditions exacted by respondent before he would answer any questions were unreasonable and thus in effect constituted a willful disobedience of the order to cooperate.

■ We think that the evidence is amply sufficient to uphold the conclusion that the principal condition imposed by respondent, i.e., limiting Fuchs to questions directed solely to activities in Los Angeles County and restricting the place for the asking of such questions to his office and then requiring that Goertzen ask questions only when he was in his own office, constituted a deliberately designed tactic calculated to frustrate the investigation then in progress and thus, independent of what reporting technique was used, was an unwarranted disobedience of the order to cooperate.

The board found that the foregoing incident "in and of itself is sufficient to warrant the punitive action of dismissal. . . ."

*Specification 3* charges "Misuse of state property" (Gov. Code, § 19572, subd. (p)) in that respondent instructed DMV employees under his supervision to make trips during working hours for purposes other than carrying out state business. The instances found to be true are:

"a) On January 30, 1962, Investigators Wilsey and Goldberg transported a refrigerator from San Francisco from the home of Chief Special Investigator Scanland in Sacramento.

"b) On February 27, 1962, Wilsey, accompanied by appellant, transported a refrigerator and washer-dryer from San Francisco to the home of Department of Motor Vehicles Registrar Veglia in Sacramento.

"c) On May 16, 1962, Wilsey transported shrubbery and plants from San Francisco to Veglia's home in Sacramento.

"d) On May 18, 1962, appellant, accompanied by Wilsey, drove a state vehicle from San Francisco to Veglia's home in Sacramento where Wilsey spent a full day planting the shrubbery and plants referred to in subparagraph (c) next above.

"e) On March 20, 1963, Wilsey transported some plants from San Francisco to Sacramento in a state vehicle and delivered the plants to Veglia's home.

"f) On October 4 and 5, 1961, Wilsey transported certain produce and on August 16 and 17, 1962, he transported plants and shrubs to the home of Assistant Chief Special Investigator Genser in Los Angeles. Each of said trips required two working days and each of said trips was made in a state vehicle."

The board went on to find that "On each of said trips the Department of Motor Vehicles employees involved claimed and were paid expenses by the State of California. While appellant

[respondent herein] did not specifically instruct said employees to claim expenses, he did know that they would do so and appellant expected said employees to make claims and be paid expenses."

■ *Specifications 5, 6, 7 and 8* are based upon violations of the department's "Statement of Incompatible Activities," copies of which had previously been routinely circulated to all DMV supervisors and administrators, a category in which respondent was included. Respective counsel stipulated at the hearing that such routine had been followed. Respondent never denied that he had received such a copy, although he had ample opportunity to do so while testifying at the hearing.

However, respondent's brief on appeal suggests that there is no evidence that respondent did in fact receive such a copy. We think that, with no evidence to the contrary, it is sufficient to rely upon the presumption ''That the ordinary course of business has been followed.'' (Code Civ. Proc., § 1963, subd. 20.)

■ The above statement of proscribed activities is promulgated under the provisions of Government Code section 19251 and makes more specific the following provisions of Government Code section 19572, subdivision (r)[2]: "Any other failure of good behavior or acts either during or outside of duty hours which are incompatible with or inimical to the public service."

The relevant paragraphs of the above statement prohibit the following:

"5. To directly or indirectly solicit, seek, or accept personal loans, gifts, gratuities, business, compensation, or favors from business firms or their agents who operate under occupational licenses issued under Division Five of the California Vehicle Code.[3]

"6. To purchase supplies or equipment at special discounts or special concessions from business firms (or their agents) who operate under certificates or licenses issued by the Department unless such discounts or concessions are also available to other State employees.

"7. To use or attempt to use for private gain or advantage, either during or outside of office hours, any Departmental

---

[2]Now (t).

[3]*All* car dealers mentioned herein are so classified.

symbol, badge, identification card, records, information, facilities, equipment, supplies, services, or the prestige or influence of a Department of Motor Vehicles position.''

We do not agree with respondent's contention that the foregoing proscriptions are ''vague and indefinite.'' (Cf. *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859] ; *Crees* v. *California State Board of Medical Examiners,* 213 Cal.App. 2d 195, 215 [28 Cal.Rptr. 621].)

Most of the misconduct now under discussion relates to respondent's use of the prestige of his position in the department to induce various car dealers to buy raffle tickets and ''appreciation'' dinner tickets, to lend cars to his friends for pleasure or vacation trips and to sell him cars at dealer's cost, which he in turn would sell at a profit to himself.

The board also found that respondent improperly pressured the investigators under his supervision to buy or attempt to sell said raffle tickets and dinner tickets.

The board was apparently much concerned about specification 7, as to which it found a cause for discipline, and stated that said cause ''in and of itself is sufficient to warrant the punitive action of dismissal. . . .''

This charge involved the obtaining of a Buick and a Chevy II from dealers. The Buick dealer's sales manager testified that he sold a Buick ''Riviera'' to respondent for $3,889.60; that this amount ''is roughly $250.00 less than the same specific automobile could be purchased by some one walking in''; that he never saw the car; that he acted on directions from a Buick distributor to sell it to respondent at cost; that he knew that respondent was with the Department of Motor Vehicles.

The purchaser of the Buick, who was a friend of respondent, testified that respondent told him that ''he had located the particular kind of car that I wanted.'' Upon delivery of the car, the purchaser paid respondent $4,104.04.

Respondent thereafter took a trip to Europe. On his return he was advised by a fellow employee that he was under investigation. The purchaser testified that respondent called him and explained that he was returning $150 because the car did not have all of the equipment that he thought it had. Respondent testified, ''I am pretty sure that I did give him the [$150] check when I returned from Europe.'' The respondent had returned from Europe on May 29, 1963, and the check was dated June 5.

The Chevy II dealer's agent testified that respondent ordered a Chevy II from him on August 2, 1962; that he sold it exactly at the cost price, $2,617.93; that his company would only make such no-profit sales "three or four times, maybe five times" a year.

Respondent handled the entire transaction for the purchaser, a young woman employed by the department, and collected $2,767.93 from her. The following year, after his return from Europe, respondent returned $150 to her.

■ The basic charge against respondent was not the making of a profit. It was the manner in which respondent used his official position to obtain favors from dealers under the supervision of his department. Such transactions were thus clearly violative of the statement of incompatible activities. The fact that respondent could make such a quick easy profit merely demonstrates the point that respondent was obtaining favors which others could not obtain and that he was using his official position in order to do so.

We are satisfied that the Department of Motor Vehicles had ample cause for taking the disciplinary action which it did; that the findings of the State Personnel Board upholding such action are, and each is, supported by substantial evidence; and that the decision of such board is not an abuse of its discretion.

Therefore, the judgment of the superior court is reversed and said court is directed to discharge the writ of mandate issued by it and enter judgment in favor of the State Personnel Board.

Shoemaker, P. J., and Taylor, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 18, 1966. Mosk, J., did not participate therein.