[Civ. No. 15239. Third Dist. June 3, 1976.]

JACK B. WILSON, Plaintiff and Respondent, v.
STATE PERSONNEL BOARD, Defendant and Appellant.

## COUNSEL

Evelle J. Younger, Attorney General, and Dennis M. Eagan, Deputy Attorney General, for Defendant and Appellant.

Thomas W. Martin for Plaintiff and Respondent.

**OPINION**

**PARAS, J.**—The State Personnel Board (Board) appeals from a judgment of the superior court ordering the issuance of a peremptory writ of mandate. The writ commands the Board to set aside and reconsider its decision affirming petitioner Wilson's dismissal from employment.

Wilson, a fish and game warden in the Santa Cruz area, was dismissed on January 21, 1968, after 21 years with the Fish and Game Department. The department's notice of punitive action stated that the dismissal was based upon (1) inefficiency, (2) inexcusable neglect of duty, (3) dishonesty and (4) misuse of state property (Gov. Code, § 19572, subds. (c), (d), (f), and (p)), citing a number of specific acts and omissions. He appealed to the Board, and a four-day hearing was held before an administrative hearing officer (Robert L. Hill) in September and November 1968. Hill found that Wilson's conduct came within all four subdivisions of section 19572, and his proposed decision was adopted by the Board. Paragraph III of the decision made five findings of fact (III-1 to III-5 inclusive) relating to dishonesty, misuse of state property, and inexcusable neglect of duty. Paragraph IV made two separately designated sets of findings relating to inefficiency. Finding IV-1 determined that Wilson filed two Fish and Game Code violation citations in the appropriate court over two years after their issuance and another such citation over eight months after its issuance. Finding IV-2 determined the filing of eight more such citations as follows: a citation issued 1/8/67, with a 1/17/67 appearance date, filed 1/17/67; three citations issued 2/18/67 and 2/19/67, all with a 3/9/67 appearance date, filed 3/7/67; a citation issued 2/4/67, with a 2/23/67 appearance date, filed 3/7/67; and two citations issued 8/5/67 and another on 8/13/67, all with 8/31/67 appearance dates, filed 8/27/67.

Wilson then sought and obtained a peremptory writ of mandate from the superior court, which held that the hearing officer had committed prejudicial error in refusing to allow Wilson properly to cross-examine a crucial adverse witness, Captain Niles J. Millen, as to Millen's motive, bias and interest.

In compliance with the superior court's ruling, a second administrative hearing was held in November 1971 before a different hearing officer (Charles H. Bobby), limited solely to the issue of Captain Millen's alleged bias. After the hearing, Bobby found (finding VI) that "The evidence fails to establish any bias, motive or interest upon the part of

the witness Niles J. Millen which would in any way impugn his credibility." He incorporated the findings from the previous hearing into his own proposed decision, and the Board adopted it on January 13, 1972.

Once again, Wilson sought a writ of mandate from the superior court; the matter was assigned to the same trial judge, who again disagreed with the Board. The court ruled that Millen's lack of credibility was "evident on the face of the record" so that Bobby finding VI could not be sustained; therefore Hill findings III-1 and III-4 could also not be sustained. As to Hill findings IV-1 and IV-2, the court held that there was no evidence that any regulation had been violated, and that in any case, the hearing officer erred in not allowing Wilson to introduce evidence showing that other wardens also filed citations late. Finally, the court ruled that the three remaining Board findings which it did not invalidate (Hill findings III-2, III-3, and III-5), were not sufficient to justify the "harsh" penalty of dismissal.

The Board has appealed from the ensuing judgment granting the peremptory writ. We shall discuss the specific facts of each finding as we consider the legal questions it involves.

I

█ The trial court here reviewed an adjudicatory proceeding of the State Personnel Board, a constitutional agency of the State of California. The substantial evidence rule applies to such review (see *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34-36 [112 Cal.Rptr. 805, 520 P.2d 29]). In *Pereyda* v. *State Personnel Board* (1971) 15 Cal.App.3d 47, [92 Cal.Rptr. 746], we articulated the scope of appellate review of such decisions as follows:

"Since the State Personnel Board is a constitutional agency for all its adjudicatory activities (Cal. Const., art. XXIV; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634 [234 P.2d 981]) its decision . . . may be set aside only if it is found to be unsupported by any substantial evidence. All reasonable inferences must be drawn in support of the findings of the Board (*Hingsbergen* v. *State Personnel Bd.* (1966) 240 Cal.App.2d 914 [50 Cal.Rptr. 59]; *Neely* v. *California State Personnel Bd.* (1965) 237 Cal.App.2d 487 [47 Cal.Rptr. 64]). The findings and determination of the Board come before the reviewing court with a strong presumption as to

their correctness and regularity. (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 330-331 [253 P.2d 659]; *Gong* v. *City of Fremont* (1967) 250 Cal.App.2d 568, 573-574 [58 Cal.Rptr. 664].) The court may not take into account whatever evidence detracts from the weight of other evidence. (*Neely* v. *California State Personnel Bd., supra,* at p. 489.)

" 'The court may not substitute a decision contrary to that made by the department, even though such decision is equally or more reasonable, if the determination by the department is one which could have been made by reasonable people. . . .' (*Kirby* v. *Alcoholic Bev. etc. App. Bd.* (1968) 261 Cal.App.2d 119, 122 [67 Cal.Rptr. 628].)

"Inferences based upon circumstantial evidence are sufficient to support a finding. (*People* v. *Goldstein* (1956) 139 Cal.App.2d 146, 155 [293 P.2d 495].)" (15 Cal.App.3d at p. 50.)

We have also stated:

"Factual determinations are not subject to re-examination in a *trial de novo,* but are to be upheld by a reviewing court if they are supported by substantial evidence. *Neely* v. *State Personnel Bd.* (1965) 237 Cal.App.2d 487, 489 [47 Cal.Rptr. 64]. The review is to be limited to considerations of whether the board exceeded its jurisdiction, committed errors of law, abused its discretion, or made findings unsupported by substantial evidence. *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125 [173 P.2d 545]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33]." (*Long* v. *State Personnel Bd.* (1974) 41 Cal.App.3d 1000, 1008-1009 [116 Cal.Rptr. 562].)

In *Winton* v. *Municipal Court* (1975) 48 Cal.App.3d 228 [121 Cal.Rptr. 561], we noted that in an appeal from superior court review proceedings in such cases, the Court of Appeal is not bound by determinations of the trial court. We stated (at p. 237): "Our role as a Court of Appeal reviewing the action of the superior court in such a case is akin to the Supreme Court's role in reviewing decisions of Courts of Appeal. Where, as here, the superior court . . . conducts in effect an appellate review of municipal court proceedings, and does not itself take evidence or make independent factual determinations, it rules on a pure question of law, which it is in no better position to do than a Court of Appeal. Hence the scope of our review of the [trial] court's decision is coextensive with that of the superior court. (See *Applegate Drayage Co.* v. *Municipal Court,*

*supra,* pp. 635, 636.)" That rule applies as well to this case, for the same reasons.

In accordance with these principles of law, we consider the issues.

## II

We note first what is *not* in dispute. In its judgment, the superior court ruled that findings III-2, III-3, and III-5 were supported by the evidence; Wilson has not appealed. These findings were to the effect that Wilson had inexcusably neglected his "duty to make honest reports with respect to his official activities within the meaning of Government Code section 19572, subdivision (d) 'and' misuse[d] . . . state property within the meaning of Government Code ·section 19572(p), [in the following respects:]

"        .    .    .    .    .    .    .    .    .    .    .    .    .    .    "    .    .    .    .

[III-2:] "On November 3, 1966 appellant [Wilson] drove in his state vehicle to Gilroy to be present when an operation was performed on a stallion appellant owned. Appellant recorded this trip as being made on state business.

[III-3:] "Following the death of his stallion appellant drove in his state vehicle to the Morgan Hill area on two occasions to discuss the stallion's value. Appellant recorded these trips as being made on state business.

"        .    .    .    .    .    .    .    .    .    .    :    .    .    .    .    .    .    .

[III-5:] "In his reports for September 25, 1967 appellant stated that he went on duty at 10:00 a.m. in Placerville, left a citation and evidence at the Sheriff's office there and patrolled the area en route to Santa Cruz arriving there at midnight with a total of 13 hours on duty. It is less than 200 miles from Placerville to Santa Cruz and appellant did not spend anything approaching 13 hours on duty on September 25, 1967. In fact when appellant left Placerville he drove in his state car on an unauthorized trip to his former home in Sebastopol where he spent the night."

In each of these instances, Wilson admitted making a false report, but sought to mitigate his conduct.

There were two fish and game wardens in Santa Cruz County, Wilson and James Holven. Wilson resided in and was responsible for the Santa Cruz district, consisting of the western half of the county, west of the Soquel area; Holven operated in the Watsonville district, consisting of the eastern half of the county. Captain Millen was their supervisor, and also the supervisor of the wardens in the adjoining Counties of San Mateo and Santa Clara. While there was some flexibility between Holven and Wilson as to overlapping coverage within the two halves of Santa Cruz County, this was not the case regarding patrol in other counties. Out-of-county patrol was limited to special assignment, with Millen's prior approval and permission.

The evidence as to finding III-2 shows the following. On November 3, 1966, Wilson, in his state vehicle, visited a friend's ranch in Gilroy, which is in Santa Clara County, outside Wilson's district. His sole purpose for going there was to witness a surgical operation to be performed that day on a horse he owned and boarded at the ranch. Wilson arrived at the ranch at approximately 11 a.m. and did not leave until around 2:30 p.m. On his weekly patrol report, he reported this Gilroy trip as a part of the performance of his official duties, without specifying the purpose of the trip or the amount of time it consumed. At the hearing, Wilson admitted that five hours recorded on the report under code P-27 ("Other Activities") for this day were actually attributable to the time spent in Gilroy on this personal business.

The evidence relating to finding III-3 shows that one Eugene Vaughn is a horse trainer whose home and training stable are in San Martin, near the town of Morgan Hill, in Santa Clara County. On March 9, 1967, Wilson visited Vaughn's stable in his state vehicle in order to get a professional opinion on the value of a horse Wilson had recently lost. The visit consumed 45 minutes to an hour, and the discussion of the horse's value occupied most of that time. They also spoke generally of horse shows and horses, and there was a "brief conversation" about the hunter safety program. This trip into Santa Clara County was without permission from Millen.

Wilson allotted five hours on his patrol report for March 9 to code P-27; he testified that approximately two of the hours so recorded were for meals. When asked what type of activity the remaining three hours represented, he replied, "Well, possibly some reports and talking to Gene Vaughn."

There was a second visit to Vaughn's home in the state vehicle by Wilson, a week to a month after the first visit. Wilson pinpointed the date of this second visit as April 9, 1967. According to him, he had compiled a list of the projected stud fees which his dead horse could have earned, and wanted Vaughn to check it over—again with a view to determining the horse's value. Before going to Vaughn's home on this occasion, Wilson attended a first aid class in San Jose at which both Millen and Holven were present. The most direct route from the training session in San Jose back to his district in Santa Cruz County was over State Highway 17 to Santa Cruz—a distance of some 30 miles. Instead, in order to visit Vaughn, Wilson took a route back to Santa Cruz which covered approximately 65 miles: down through Santa Clara County to Morgan Hill, then over Hecker Pass to Watsonville in southern Santa Cruz County, then back up to Santa Cruz. Again there was no prior permission for this unnecessary travel in Santa Clara County.

The evidence relating to finding III-5 shows the following: Wilson filed a daily activity report for Monday, September 25, 1967. Under the "Time" heading on the report, he listed "1000-2400," indicating the duty hours he worked on that day (14 hours). Next to the "Time" entry on the report, under "Location and Activities," appears the following two-sentence entry: "Pat. [patrol] to S.O. [Sheriff's Office] Placerville—left citation and evidence for Kastner. Pat. Shingle Springs area, Rancho Cordova, Sacto enroute to Hdqs. [headquarters] from late season deer opening detail."

The travel claim which Wilson subsequently submitted includes a requested reimbursement for a bridge toll on the Golden Gate Bridge in San Francisco, paid on September 25, 1967. His gasoline credit card purchase slips for the month of September 1967 also indicate a purchase of gasoline in San Francisco on the same day.

In the monthly travel log for his state vehicle for September 1967, Wilson's "Travel Route" for the 25th is given as "El Dorado County." His "Location at end of day" is either left blank, or reads "Placerville," depending upon what interpretation is given to a single slash mark appearing in that box. There is no entry for September 26. The September 27 entry lists "Travel Route" as "Santa Cruz County" and "Location at end of day" as "Headquarters."

In the report, Wilson credited his "patrol" on September 25, 1967 to code P-7, which is defined as follows:

*"Big Game*

"Includes all law enforcement work connected with deer, elk, antelope, bear, sheep, and wild pig. Includes time spent checking licenses, equipment, and game taken by big game hunters; and patrol of areas which are frequented during open or closed seasons by big game hunters."

Since Monday was one of his normal days off, Wilson claimed eight hours of "compensating time off" for Monday, September 25, 1967, the maximum allowable (Cal. Admin. Code, tit. 2, § 132). He also claimed $18 as "Travel Expenses" for that day, the maximum amount of per diem expense claimable.

At the hearing, the truth was disclosed. Wilson left Placerville around 11 a.m. on September 25, 1967; in Wilson's words, there was no patrol activity "as such" thereafter. Instead he followed one Bob Norden, a man he met in a Placerville coffee shop, to Shingle Springs; there Wilson left his state vehicle and went with Norden to look at a horse. Afterwards, they returned to Wilson's state vehicle and talked "in the cars." The pair reached Rancho Cordova late that afternoon. They went to a Rancho Cordova restaurant for dinner around 5:30 p.m., and left the restaurant some three and one-half hours later. Asked by the hearing officer what had transpired in the restaurant during this period of time, Wilson replied, "Well, we ate dinner and we seemed to have a lot of things in common and we just visited."

Wilson arrived in Sacramento around 10 p.m. that night, at least 11 hours after he had left Placerville. Leaving Sacramento, he testified that he proceeded to his own property and former home in Sebastopol, passing south of Sonoma and through Petaluma enroute, arriving around midnight. He spent the night there, and returned to Santa Cruz the following afternoon, September 26, 1967.

Regarding the failure of his reports to indicate either the fact of his trip to Sebastopol or his actual return to Santa Cruz on September 26, 1967, Wilson cryptically explained that "I didn't want to collect any expenses for the next day, my day off . . . ." September 25 and 26 were both days off.

The foregoing fairly summarizes the evidence relating to the three undisputed findings, which supports the Board's conclusion that Wilson

filed dishonest reports and misused state property (his state vehicle) for personal business. Interestingly, fish and game wardens are on 24-hour call and may often be required to work odd hours, or more than 8 hours a day to handle particular problems. Given this flexibility, Wilson could, if it did not otherwise interfere with his duties, properly take time out to seek advice from Vaughn, to observe the operation on his horse, and to chat with a chance acquaintance in Placerville. The evil lay not in doing what he did but in reporting it untruthfully and dishonestly. For he listed time spent on personal business as *overtime* (5 hours overtime on the day he observed the operation, and 13 hours overtime for the Placerville trip). As to the Placerville trip, his claim of 8 of the hours as "compensating time off" meant that he was entitled as a matter of right to take 8 hours off later and get paid for them. As to the remaining overtime, it was the custom and practice in the department for the captain to voluntarily give (in his discretion) a few hours of time off to fish and game wardens who had recorded substantial overtime on working days (for which days no compensating time off is awarded).

III

We consider in one grouping the evidence relating to three findings of the Board (Hill findings III-1 and III-4 and Bobby finding VI). It will be recalled that finding VI was to the effect that the "[e]vidence fails to establish any bias, motive or interest . . . of . . . Millen which would in any way impugn his credibility," but the trial court vacated it because Millen's lack of credibility was "evident on the face of the record" (as a result of which findings III-1 and III-4 were also vacated).

Finding III-1 states "On July 30, 1966 appellant falsely reported to the radio dispatcher that he was in Ben Lomond when in fact appellant was at his home in Santa Cruz." In support of it, Captain Millen testified that he visited Wilson's home in the morning of July 30, 1966, and again at 1:10 p.m. He found Wilson absent, several day's accumulation of mail in the mailbox, and Wilson's state vehicle parked at the "far" end of the house. At about 3 p.m., Millen returned to the house and noticed that the mail had been picked up at the foot of the driveway (Wilson's house was secluded by trees and not visible from the road). Apparently to prevent Wilson from knowing his activities were being monitored, Millen drove up to a subdivision in back of Wilson's property and walked down a little road from which he could observe the back of Wilson's house. He testified that "Mrs. Wilson at the time was removing various items from

the trunk of their personal car, and I walked back around up this little back road to where I could again observe the State car in the same area I had observed it earlier in the day." This last observation occurred at 3:05 p.m.

The Santa Cruz County radio dispatcher testified that she received a radio transmission from Wilson at one minute before 3 p.m. stating, that he ". . . went in service at Ben Lomond, and if Don Burge calls me [estimated time of arrival] is 15 minutes. . . ." Ben Lomond is five miles from Wilson's house. Thus if Millen's testimony is accurate, Wilson radioed the dispatcher from his home and not Ben Lomond.

Wilson testified that he had, in fact, been away from his home on the morning of July 30, 1966 and returned at approximately 1:30 or 1:40 p.m. Almost immediately he received a call about a shooting accident in the Ben Lomond area and left in the state vehicle shortly before 2 p.m. to investigate. He explained that his "In service Ben Lomond" transmission (made, according to Wilson, one hour after he left his home in the state vehicle and shortly before he returned) was made while he was returning to his home, about a mile and a half away. He said traffic was heavy on the radio, and he could not get through until then. He said he asked the dispatcher to contact Reserve Warden Burge, because "I had . . . to meet [him] at Spivey's [restaurant] at 3:00 o'clock, and because of this emergency call I was going to be late. I advised her my ETA was 15 minutes." He then returned to his house, picked up the mail at the mailbox at the foot of the driveway, read it quickly, and departed again sometime after 3 p.m. to pick up Don Burge. Wilson said that since they planned to work until 4 or 5 a.m. the next morning "on spot lighting" (for deer hunters apparently), he had planned not to start work until 3 p.m., and therefore had asked the reserve warden not to come until then.

The Santa Cruz County radio dispatch log shows an unsuccessful attempt to contact Wilson at 2:26 p.m., despite Wilson's testimony that the radio was so busy that he could not report his position for almost an hour prior to 3 p.m. Wilson added that his radio was on during this period but he did not remember any such call.

Certainly this evidence supports the Board finding that Wilson lied when he reported himself at Ben Lomond but was in fact at his home, unless the testimony of Millen is totally disregarded, as was done by the trial court.

Finding III-4 states: "In a radio contact with his supervisor on August 10, 1967 appellant falsely reported that he was in the vicinity of Scotts Valley City Hall when in fact appellant was at his home in Santa Cruz." In support of it, the evidence shows that on August 10, 1967, at about 11 a.m., Captain Millen observed Wilson's home from his vantage point on the road behind it, and saw a Santa Cruz County jeep (used by wardens at times for fish and game patrols) parked there. Wilson's state vehicle was not there. Millen then drove around to Wilson's driveway in front of the house (he could not see the house from the road) and radioed Wilson. About 15 minutes elapsed between Millen's observation and the radio call. Wilson reported on the radio that he was "just leaving the Scotts Valley City Hall." Millen told Wilson to meet him at the Municipal Pier in Santa Cruz. Millen drove to the pier, where Wilson arrived "between 11:30 and 12:00," *driving the jeep.*

Wilson testified that he left his home in the county jeep at 10:30 a.m. and patrolled briefly before returning home to read the mail. He left again in the county jeep on a patrol which took him through Scotts Valley and several miles up Glenwood Road. After doing some investigation in the area, he returned along Glenwood Road, then down Scotts Valley Drive past Scotts Valley city hall. All this took about 40 minutes. While he was passing Scotts Valley city hall, he received Captain Millen's radio call. On his way to the pier he stopped briefly at the county garage, and arrived at the pier about 15 minutes after the call. Scotts Valley city hall is three and a half to four miles from Wilson's home. Wilson testified, and stated in his weekly report, that he met and conferred with Millen at 12:30 p.m.

Again this evidence supports the Board finding that Wilson lied when he reported himself at Scotts Valley city hall rather than at his home, unless the Millen testimony is deemed totally incredible.

Therefore we must examine the evidence to determine whether findings III-1 and III-4 are truly not supported by the evidence because Millen's lack of credibility is "evident on the face of the record." ■ Credibility, or lack thereof, is for the factfinder, not the reviewing court, to determine. The trier of fact's determination will be interfered with on appeal only when it appears that the witness' testimony is inherently so improbable as to be unworthy of belief. (54 Cal.Jur.2d, Witnesses, §§ 200, 202, pp. 653, 664.) "On the cold record a witness may be clear, concise, direct, unimpeached, uncontradicted—but

on a face to face evaluation, so exude insincerity as to render his credibility factor nil. Another witness may fumble, bumble, be unsure, uncertain, contradict himself, and on the basis of a written transcript be hardly worthy of belief. But one who sees, hears and observes him may be convinced of his honesty, his integrity, his reliability." (*Meiner* v. *Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140 [94 Cal.Rptr. 702].)

According to Wilson, the following show Millen's lack of credibility:

(a) Millen testified in connection with finding III-1 on examination by Wilson's counsel that on July 30, 1966, he personally heard (on his radio) Wilson's radio report of 2:59 p.m. to the dispatcher. He also testified that he "probably" discussed this with Wilson in 1966 (this testimony was given on November 22, 1971). Later on he stated that he was in error when he stated that he personally heard the radio call, having confused it with another incident; also he stated that he didn't believe he had discussed that incident with Wilson.

(b) Millen was directed in 1967 to report to headquarters as to Wilson's ability to perform his duties. He did so, reporting favorably on Wilson, but also indicated that he had not been able to talk to Wilson about any physical disability. The evidence, although not conclusive on the subject, is susceptible of the inference that Wilson and Millen spoke on two occasions before the report, so that Millen might have had the opportunity to discuss Wilson's physical condition with him.

(c) Wilson left his holster and service pistol in the front seat of his unlocked and unattended state vehicle in an area near a place where jail trustees were working. The weapon was noticed by sheriff's deputies who took it for safekeeping and later advised Millen of what occurred. Instead of immediately getting the weapon or telling Wilson about it, Millen told the sheriff's office to retain it, and in order to see if Wilson would tell a truthful story, asked Wilson about his pistol. Wilson related that he had lost it while on a personal trip to Sebastopol and had filed a report with the Sebastopol police. Millen then investigated and determined that the Sebastopol police had no record of such a report. This incident is cited as showing bias and prejudice of Millen so as to make him unworthy of belief.

(d) On November 29, 1967, Millen orally reprimanded Wilson for using a Santa Cruz County jeep to go to a meeting in San Jose (Santa

Clara County), contrary to a standing instruction that the jeep was not to be used outside Santa Cruz County. Wilson had started the trip in the jeep, and after going a substantial distance made radio contact with Millen; since he was already underway and had to be at the meeting within a certain time, Wilson was told that he might as well continue in the jeep; at the meeting the reprimand took place, consisting of a simple statement to Wilson that the trip in the jeep was contrary to established policy. It is claimed that having acquiesced in the use of the jeep, Millen had no right to later reprimand, and that this further shows that he is unworthy of belief.

(e) A Mr. McFarland complained verbally to Millen that members of his angling and hunting club had tried unsuccessfully a half-dozen times to contact Wilson about fishing law violations. Millen told McFarland to put his complaint in writing, which was done, in the form of a letter to headquarters. Millen's request to put the complaint in writing is claimed to demonstrate bias.

(f) There was hearsay testimony (timely objected to) to the effect that Millen asked that additional entries be made in radio logs to show that Wilson was unavailable and did not respond when radio calls were put out to him. This was denied by Millen.[1]

It is immediately apparent that the foregoing incidents cannot be used to overturn the factfinder's determination that Millen's testimony as it related to findings III-1 and III-4 is believable. If the hearing officer and the Board had chosen not to believe Millen, such matters would have been supportive of their conclusion. But they cannot be used by a reviewing court to usurp the Board's fundamental right to make the determination as to which witness is accurate, truthful, or biased. "Discrepancies in a witness' testimony or between his testimony and that of others do not necessarily mean that the witness should be discredited." (BAJI No. 2.21; *Dodds* v. *Stellar* (1946) 77 Cal.App.2d 411, 426 [175 P.2d 607].) Jurors are so instructed in countless cases, because the only practical and sensible way to resolve matters of credibility is to leave them to the trier of fact.

---

[1] Several more such collateral instances are cited by Wilson, and presumably were used by the trial court in reaching the conclusion that Millen's testimony was unworthy of belief. They are similar in nature to those enumerated, and for our purposes need not be here recited.

■ We have carefully reviewed the record and concluded that the trial court's holding that "Millen's lack of credibility is evident on the face of the record" is unwarranted. The testimony of Millen was on the whole coherent, intelligible, and not at all inherently improbable. The existence of inconsistencies in his testimony and of facts which can arguably show bias did nothing more than to test his credibility before the Board, not the superior court, nor us. If the substantial evidence test of administrative review (or any appellate review) is to have any meaning at all, we must reverse the trial court and reinstate finding VI.

It follows that findings III-1 and III-4 are supported by substantial evidence and should also be reinstated.

## IV

■ We next consider Hill findings IV-1 and IV-2, relating to the late filing of citations, as constituting inefficiency under Government Code section 19572, subdivision (c). As heretofore noted, the trial court ruled that these findings are not supported by substantial evidence because there was no evidence of any regulation of the Department of Fish and Game that had been violated by the late filing of citations, and because the hearing officer at the second hearing had erred in not admitting citations "allegedly showing the [similar] practice of other fish and game wardens."

Inefficiency may be established without evidence of the existence of a specific rule. Good sense dictates that no regulation or rule is necessary to establish that where a law enforcement officer cites a citizen to appear in court on a given day and does not file the citation in that court until two years later, he is guilty of inefficiency. Such a requirement would place upon state agencies the impossible burden of attempting to conjure up all the various hypothetical forms of inefficiency which could occur on the job and then commit them to writing. The product of such a task would reach unmanageable proportions, and not all of the reasonably possible situations would ever be covered. The superior court's interpretation of what is required under section 19572, subdivision (c), would effectively eliminate "inefficiency" as a ground for discipline. (See *Neely* v. *State Personnel Bd.* (1965) 237 Cal.App.2d 487 [47 Cal.Rptr. 64].)

■ Nor was there error on the part of the hearing officer for refusing an offer into evidence of court docket sheets showing that other wardens

filed citations shortly before the date of hearing. A driver who violates speed laws is no less guilty because other drivers are also speeding. What others may or may not have done is irrelevant, especially when the specific citations offered in this case are considered. There were 26 such citations offered, covering a 2-year period, with 10 complainants (probably, though not necessarily, game wardens). Of these, 1 complainant had filed 9 such citations (covering 1 year and 8 months), another had filed 3, and the remaining 8 had filed 1 or 2. Wilson was shown to have filed all 11 of his late citations during an 8-month period in 1967 (2 of which were *issued* in 1965). Considering that this rejected evidence was offered to show "a common and established practice on the part of wardens," it proves at best only that Wilson and possibly one other game warden engaged in the "practice," hardly making it common and established. Furthermore, this is the type of evidence which is properly excludable under Evidence Code section 352. It was offered at the second administrative hearing, which was limited to the issue of bias and prejudice of Millen in accordance with the first ruling of the trial court. On that issue, it was irrelevant; but even if relevant it was far too remote, particularly with no foundation whatever to show that Millen knew of and condoned such practices by other wardens; the hearing officer did not abuse his discretion when he rejected it.

■ Wilson's conduct in regard to the late filing of citations is particularly inexcusable because he had been formally reprimanded in 1966 for similar delays in filing. The evil of filings after the date of appearance shown on the citation is so thoroughly obvious as to require no discussion. The evil of filings a very few days before the appearance date is that the persons cited are not given the opportunity to forfeit bail and thus avoid attendance at court, sometimes involving substantial unnecessary travel and expense to them. Additionally, when a citation is not filed and the person cited makes inquiry of the court, there is no meaningful communication that can be had. Knowing this, Wilson persisted in his practice. At the very least, this was inefficiency.

V

Having erroneously vacated the Board findings discussed above, the trial court then held that for the violations which it sustained, the penalty of discharge was too harsh. ■ Since we have determined that all findings of the Board should be sustained, we hold that the overall conduct of Wilson was such that the penalty imposed by the Board was warranted.

The position of fish and game warden is by its very nature such that very little direct supervision over the performance of duties can be maintained. The Fish and Game Department must of necessity not only place full trust and confidence in its wardens, but also must totally rely upon the accuracy and honesty of their oral and written reports as to their use of state time and equipment. Any breach of trust must therefore be looked upon with deep concern. Dishonesty in such matters of public trust is intolerable.

The September 25, 1967, incident (finding III-5) alone would support a disciplinary discharge under these circumstances; as above indicated, on that occasion Wilson falsely reported eight hours of overtime, entitling him to later take a full day off and be paid for it. He also obtained the maximum allowable cash expense allowance for that day. This is pure and simple cheating; some might even call it theft (see Pen. Code, § 484). It certainly amounts to taking money fraudulently from one's employer, which money the employee has not earned and to which he is not entitled. Short of physical violence, it is hard to imagine a more serious offense by an employee against an employer.

Cheating of this sort is unendurable and should not be taken lightly. No employer, including the state, is to be condemned for terminating one who has willfully defrauded his employer in such fashion. To such offense are added in this case the numerous other proven instances of dishonesty, misuse of state property, neglect of duty, and inefficiency, over the course of at least two years, which beyond question justify the discharge.

## VI

■ Wilson claims that even if the Board is upheld, he is still entitled to retroactive pay under *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774]. He was discharged on January 21, 1968, but the first administrative ruling was not made until one year later, January 24, 1969 (evidence was first taken on Oct. 1, 1968, because at Wilson's request the first hearing date of Mar. 19, 1968 was vacated and the case taken off calendar indefinitely, to be reset upon Wilson's request).

If he had raised the due process issue in the superior court, Wilson's contention would be upheld (at least to the extent that he is not estopped to claim retroactive pay by himself delaying the hearing). Such was the

case in *Keely* v. *State Personnel Board* (1975) 53 Cal.App.3d 88 [125 Cal.Rptr. 398] and *Kristal* v. *State Personnel Bd.* (1975) 50 Cal.App.3d 230 [123 Cal.Rptr. 512], as well as *Skelly, supra.* But here the issue was never mentioned until the filing of Wilson's respondent's brief on appeal. The general rule is that contentions not raised in the trial court may not be raised for the first time on appeal. (5 Cal.Jur.3d, Appellate Review, § 480, p. 117 et seq.) *Skelly* v. *State Personnel Board, supra,* did not change that basic rule.

The judgment is reversed, all findings of the Board are reinstated, and the trial court is directed to deny the writ.

Janes, Acting P. J., and Evans, J., concurred.

A petition for a rehearing was denied June 25, 1976, and respondent's petition for a hearing by the Supreme Court was denied July 28, 1976.