Filed 2/20/25 Torres v. Civil Service Com. of the City of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| JESSE TORRES, | D082742 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2022-00025320-CU-WM-CTL) |
| CIVIL SERVICE COMMISSION OF THE CITY OF SAN DIEGO, | |
| Respondent; | |
| CITY OF SAN DIEGO, | |
| Real Party in Interest and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Affirmed in part, reversed in part, and remanded with directions.

Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney, Paul H. James, Deputy City Attorney, for Real Party in Interest and Appellant.

Higgs Fletcher & Mack, John Morris, and Steven M. Brunolli for Plaintiff and Respondent.

No appearance for Respondent.

In 2021, the City of San Diego (City) terminated Jesse Torres from his employment as a police officer. Torres appealed to the Civil Service Commission of the City of San Diego (CSC), which affirmed the termination.[1] He then filed a writ of administrative mandamus in the Superior Court of the County of San Diego requesting that the court set aside the CSC's decision and reinstate him to his former position. The trial court granted the writ and remanded to the CSC to impose appropriate discipline, but ruled that termination was "off the table."

The City appealed, arguing the trial court improperly: (1) substituted its own discretion for that of the CSC; (2) reevaluated the weight of witness testimony; and (3) interfered with the CSC's exercise of its discretion to uphold the termination decision. It contends the appeal relates solely to the severity of punishment imposed by CSC and argues that we, therefore, should review de novo whether the CSC abused its discretion. Torres is of the view that we, like the trial court, must exercise our independent judgment. We disagree with both parties as to the appropriate standard of review and conclude substantial evidence supports the trial court's determination that the CSC abused its discretion in "fail[ing] to reevaluate the level of discipline given the significantly mitigated findings." However, we do not find legal or factual support for the trial court's order on remand

---

[1]    Civil Service Commissioner Aaron Olsen convened the hearing and prepared the findings, and four other members of the commission subsequently ratified the findings of fact and conclusion. For simplicity, we refer to Commissioner Olsen and the other members of the commission collectively as the CSC.

2

that "termination is 'off the table.' "  Accordingly, we affirm in part, reverse in part, and remand with instructions to amend the trial court's remand order to remove this limitation on the CSC's disciplinary discretion.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Incident*

At the time of his termination from the San Diego Police Department (SDPD), Torres had been a police officer with the SDPD for about six-and-one-half years.  He previously had served as a police officer in Chicago for over eight years.

On November 29, 2019, Torres's sergeant directed him to deliver criminal case documents (a DA Packet) to the San Diego District Attorney's Office, located at the courthouse in San Diego, to be reviewed for potential criminal prosecution.  Torres discovered that the courthouse had closed early and, because he lived nearby, his sergeant directed him to maintain possession of the DA packet over the weekend and deliver it to the courthouse on Monday, December 2, 2019.

Torres spent the night of November 30, 2019, at the Poway home of his on-again, off-again girlfriend of six years, Holly Z.  They had lived together at the Poway home for several years in the past but lived apart at that time.

On December 1, 2019, Torres and Holly drove Holly's vehicle to dinner with friends, leaving Torres's rented vehicle at the Poway residence.  Because they intended to stay the night at Torres's residence, Torres brought the DA packet in his overnight bag so he could deliver it to the courthouse in the morning.  After dinner, they went to a bar near Torres's home.  While Torres was in the restroom, Holly left without warning in her vehicle.  She texted him saying she had left his bag on the street where the car had been parked,

3

but he did not locate it and assumed she had taken it home with her. Holly also texted that he was not welcomed at her house that night and that she would have him arrested if he came to her home.

Torres nonetheless took a rideshare to her residence in Poway to retrieve the DA Packet and his vehicle. Upon arriving, he used the gate code to enter the property and a door code to enter the garage. Both codes were the same as they had been when he lived at the home. Once inside, he searched the garage for his overnight bag. When he did not find it, he used a screwdriver to open the door to the house. He testified that the screwdriver was kept on a ledge next to the door and that both he and Holly had used it in the past to open the door when it was locked.

Torres searched for his bag inside the home and then went downstairs to Holly's bedroom to request the return of the DA Packet and his property. Holly later told an internal affairs investigator that Torres had burst into her bedroom with the screwdriver in his hand, punched the wall next to her head, and yelled at her. She backed up into the bathroom and threatened to call 911. When he did not leave, she called 911, and he sat down on the bed while she called. Holly could be heard saying "[g]et out" four times on the 911 recording.

Torres then went outside and lay down on his stomach in the driveway as San Diego County Sheriff's deputies arrived. Dispatch had categorized the call as a "burglary hot prowl." Torres explained that he had heard the nature of the call and did not want the officers to think he was armed or a threat. One sheriff's deputy placed Torres in handcuffs while another went to speak with Holly. After Torres eventually identified himself as an off-duty SDPD officer, he said the deputies helped him search the garage for the DA Packet.

4

The deputies then provided Torres with a courtesy ride to the Poway Sheriff's station, at which point he took a rideshare home. Torres was not arrested.

Approximately six hours after being detained, Torres contacted a detective and told him the DA Packet needed to be recreated. He then texted his sergeant to ask for a call back without informing him of the detention or criminal investigation. A lieutenant later called Torres, having heard about the incident involving the San Diego Sheriff's Office, to confirm Torres's department identification, access card, badge, and gun were not also missing. Torres did not report that he was detained as part of a criminal investigation. When his sergeant returned his call later and asked how the DA Packet went missing, Torres responded, "They're just missing. I don't know where they are at." He did not mention the incident or investigation.

II.

*Investigation and Disciplinary Decision*

The SDPD's Professional Standards Unit conducted a criminal investigation, but the district attorney's office declined to prosecute. Internal affairs then initiated an investigation.

Based on its investigation, internal affairs issued a report in March 2020, with the following conclusions regarding Torres's conduct on December 1–2, 2019: (1) Torres violated SDPD Policy No. 1.26 by failing to control the release of criminal records; (2) Torres violated SDPD Policy No. 9.03, which requires obedience to laws, by unlawfully trespassing into Holly's residence; (3) Torres violated SDPD Policy No. 9.03 by exhibiting a deadly weapon (the screwdriver) to Holly in an angry and threatening manner; (4) Torres violated SDPD Policy No. 9.03, which also requires officers to immediately report being subject to an investigation for a criminal offense, by failing to report his detention on December 2, 2019, to his

5

supervisor or watch commander in person or by telephone; and (5) Torres's conduct during the domestic dispute and his subsequent behavior up to December 3, 2020, was unbecoming of an officer of the SDPD in violation of SDPD Policy No. 9.06.

Captain Jerry Hara reviewed the report and agreed with the findings and recommendations. He then reviewed Torres's previous disciplinary record, which revealed that Torres had received a written warning in 2019. At that time, Torres left a backpack containing his duty weapon, ammunition, and a police-issued radio inside his locked vehicle. The backpack was then stolen. Because he had been on light duty and it had been well over a year since he had qualified for department firearms proficiency, Torres was not authorized to even have the firearm. He was found in violation of department policy and Penal Code section 25140.

Captain Hara's next step was to discuss the case with all the other SDPD captains to ensure the recommended discipline was reasonable, fair, equitable, and consistent with discipline in other commands. After confirming that termination was within SDPD's discipline matrix, Captain Hara issued Torres an Advance Notice of Adverse Action. Torres responded by requesting a "*Skelly* meeting."[2] Captain Hara presided over the meeting and ultimately decided to forward his recommendation of termination to the chief of police.

Torres filed a chief's appeal, and Captain Hara's successor, Captain Manuel Del Toro represented the department at the proceeding. Assistant

---

[2] This meeting, which draws its name from *Skelly v. State Personnel Board* (1975) 15 Cal. 3d 194, 218, affords the officer an opportunity to respond orally or in writing to the Advance Notice of Adverse Action. (See *id.* at p. 215.) Torres was also notified that he had the right to be represented by counsel.

Chief Terrance Charlot upheld the termination recommendation and forwarded the information to Chief David Nisleit for review. Chief Nisleit reviewed the investigatory findings and recommendations, as well as the records of Torres's prior discipline, and issued a Notice of Termination to Torres.

III.

*The CSC Hearing*

Torres appealed his termination with the CSC in April 2021. The CSC heard his appeal on January 19–20, 2022.

A. *Testimony of SDPD Lieutenant Tammy Clendenen*

Lieutenant Clendenen conducted the internal affairs investigation. She explained that she found Torres in violation of SDPD Policy No. 1.26, which requires officers to control the release and access to criminal records, because Holly, not Torres, maintained control of the car key. She concluded Torres violated Penal Code section 602.5, subdivision (a) because, among other things, Torres admitted using the screwdriver to enter Holly's home, he admitted he did not have consent to do so on that day, and Holly repeatedly told him to get out. Because Holly said he then yelled at her, banged on the wall, and called her names, all while holding the screwdriver, Lieutenant Clendenen concluded he violated Penal Code section 417. Infringing two criminal laws contravened SDPD Policy No 9.03, obedience to laws.

After recounting her investigation of whether Torres disclosed to his sergeant that he had been detained by law enforcement over the weekend, Lieutenant Clendenen concluded Torres failed to report to his supervisor as required by SDPD Policy No. 9.03. Finally, she explained that his conduct was unbecoming of an officer, as defined by SDPD Policy No. 9.60, because Torres attempted to conceal his actions by asking a coworker to recreate the

7

DA packet before speaking to his supervisor, disclosing minimal information regarding how the documents were lost, and failing to inform the supervisor that he had been handcuffed by sheriff's deputies. Additionally, she explained as further evidence of the charge that losing the documents impaired efficiency and reflected unfavorably on the SDPD and the district attorney's office. Failing to report his behavior meanwhile could create a perception of dishonesty or ineptitude, reflected discredit upon Torres, and demonstrated that he lacked good judgment. His criminal conduct also did not reflect favorably on Torres or the SDPD.

On cross-examination, Lieutenant Clendenen acknowledged that SDPD policy did not specify how a DA packet should be physically secured and that Torres was not given any specific instructions. She also conceded that Holly sounded calm on the 911 call and did not mention the screwdriver or any threats. Her recollection was that Holly initially was uncooperative with requests for information and access to her home. Holly later explained that she feared Torres would retaliate against her if he lost his job.

B. *Testimony of Captain Hara*

Captain Hara testified that he agreed with the internal affairs report's conclusions regarding the facts and policy violations. He said he reviewed the documents and recorded evidence from the investigation and also looked at the circumstances surrounded a written warning he issued Torres in July 2019. He then met with other commanding officers to ensure the discipline he planned to recommend was fair, reasonable, and similar to that issued in other commands. After consulting the discipline matrix regarding the allowable range of discipline for the violations, Captain Hara recommended termination to the Assistant Chief and then his command prepared the Advance Notice of Adverse Action.

8

When asked if his determination that termination was the appropriate level of discipline was "based on the totality of the circumstances and Officer Torres's actions throughout the whole evolution of events on December 1st and December 2nd and December 3rd, 2019," Captain Hara replied, "Yes, it was." He acknowledged on cross-examination, however, that he did not independently interview anyone about the incident or visit the scene. He also confirmed that a "fair number" of San Diego police officers who have been convicted of crimes are still working.

## C. *Testimony of Chief Nisleit*

Chief Nisleit testified that he agreed with the internal affairs findings and conclusions, as well as those of Captain Hara and Assistant Chief Charlot. Looking at "the totality of this incident," he explained that he thought termination was justified and "the right decision" because a very confidential document was lost, San Diego County Sheriffs had to respond to Torres's criminal conduct, and Torres had not acted in a manner that was acceptable for a police officer. He expressed how important trust was and explained that the public holds law enforcement officers to a higher standard.

## D. *Torres's Testimony*

Torres explained that he went to Holly's home that night because he believed he had a duty to locate the DA packet. He did not recall whether he had the screwdriver in his hand when he entered Holly's bedroom but said he did not have it when he sat down on her bed. He denied threatening or yelling at her.

According to Torres, Holly had threatened to call the police or find a way to make him lose his job "a plethora of times." In 2014, she called 911 and hung up, and Torres later awoke to find San Diego Sheriffs pointing their guns at him.

9

Torres explained that he did not tell his sergeant about what had happened because he thought the sheriff's department had already notified his department. He said he called the detective first because the DA packet was due that day.

Following the incident, Torres continued to have "relatively regular contact" with Holly until the week of the chief's appeal, when he learned Holly had told Captain Del Toro that she was terrified of Torres.

E. *Testimony of Captain Del Toro*

Captain Del Toro testified that he questioned Holly's credibility because she told him she was afraid to be in the same room as Torres, but his review of her text messages with Torres during the same period reflected that they had a friendly relationship. He asserted that, after receiving the totality of information, he did not see this as a termination case. He said he would feel comfortable having Torres return to work under his command.

F. *The CSC's Decision*[3]

      After summarizing the evidence at length, the CSC listed its findings. As to the violations based on failure to secure the DA packet and exhibiting a deadly weapon in a threatening manner, the CSC found the SDPD had not met its burden. It sustained the charge that Torres failed to immediately report the incident to his superior officer, noting that Torres "seemed to want to avoid a difficult conversation." Likewise, the CSC sustained the charge related to Torres's trespass at Holly's home in part because Torres "concede[d] that it was inappropriate for him to enter her home and look for the documents when he had been expressly told to stay away." Finally, the CSC concluded the SDPD had met its burden as to the unbecoming conduct violation. It explained that "[Torres's] trespass onto his ex-girlfriend's property after she informed him that he was not welcome, and his failure to immediately report that he was under investigation by the Sheriff's

---

[3]    In a separately filed motion, the City requests that we take judicial notice of: (1) Article VI (Executive and Administrative Service), Section 41 and Article VIII (Civil Service), Sections 41, 115, 117, 118 & 129 of the San Diego City Charter and (2) the San Diego Municipal Code, Chapter 2, Article 3 (Civil Service), Division 12 (Resignation, Removal, Suspension and Reduction in Compensation), section 23.1203. These materials were not presented to the trial court. The City represents that this material is relevant to the issue of the CSC's discretion. The City primarily relies upon this background information to explain the source and scope of the CSC's discretion. The municipal code section mirrors the Civil Service Rules referenced in Chief Nisleit's termination letter and included in the record as exhibit 18 of the SDPD's statement, witness, and exhibit list before the CSC. In the absence of objection, we grant the request for judicial notice pursuant to Evidence Code sections 452, subdivision (b) and 459, subdivision (a). (See *Julian Volunteer Fire Co. Assn. v. Julian-Cuyamaca Fire Protection Dist.* (2021) 62 Cal.App.5th 583, 599–600.)

11

Department to the Watch Commander or his supervisor, either in person or by telephone, sustains the charge."

Under the heading "Conclusion," the CSC stated: "[b]ased on the foregoing findings of fact and sustained charges, the Hearing Officer finds that [Torres] was afforded due process and that termination was appropriate, warranted, and justified."

IV.

*The Trial Court's Review of Torres's Writ of Administrative Mandamus*

The trial court issued a tentative ruling and then heard oral argument. Torres claimed he was denied a fair hearing on two grounds. First, he asserted that the SDPD presented only hearsay evidence from Holly, who lacked credibility. Second, he argued the CSC failed to reassess the appropriate level of punishment after concluding the SDPD failed to prove the most serious allegations.

At the outset of the hearing, the trial court stated its view that "there's no question [Torres] did these violations and some discipline would have been appropriate, but termination is the nuclear option, and that was—that's inappropriate." It also opined that there was a disconnect between the CSC's findings and its conclusion that termination was warranted. In response, the city attorney pointed out that termination was within the SDPD's discretion under the disciplinary matrix. The court replied, "I think they have to consider everything, though. They really didn't. . . ."

In its subsequent minute order, the trial court rejected the hearsay argument, and that issue is not before us on appeal. As to Torres's second contention, the trial court concluded as follows:

> "[Torres] contends that it was an abuse of discretion and a denial of fundamental due process for [the CSC] to fail to reevaluate the level of discipline given the significantly

12

mitigated findings. The Court agrees. Moreover, the impos[i]tion of termination is inconsistent with the spirit of the Discipline Matrix. Notably, the record shows that [Captain] Del Toro had concerns about [Holly]'s credibility and stated that he believed that 'suspension would have been a more appropriate level of discipline.' (AR Ex A 019; Ex F, 257-258.) The Court finds that [the CSC] abused its discretion in upholding SDPD's decision to terminate [Torres] and shall remand the matter back to [the CSC] to impose appropriate discipline up through suspension; termination is 'off the table.' The Court incorporates by reference its statements made during oral argument."

## DISCUSSION

The City contends the trial court improperly substituted its own discretion for that of the CSC and improperly reevaluated the weight of the witness testimony presented at the CSC hearing. It further argues the CSC's decision not to sustain two of the five charges does not justify the trial court's interference with the CSC's discretion. We disagree.

## I.

### *Forfeiture*

As an initial matter, Torres contends the trial court's ruling can be broken down into two holdings and that the City forfeited its challenge to the first. Specifically, Torres characterizes the two distinct components of the trial court's ruling as being that: (1) "Torres was denied due process when the Commissioner 'fail[ed] to reevaluate the level of discipline given the significantly mitigated findings' "; and (2) "the imposition of termination was 'inconsistent with the spirit of the Discipline Matrix.' "

The City disagrees that they failed to challenge the remand order, stating in their reply brief that "[t]he trial court's view that the CSC should have 'reevaluated' the level of discipline in light of the more limited sustained findings against [Torres] and its ruling that the CSC abused of discretion by

13

upholding [Torres's] termination despite such findings are, in substance, one and the same."[4]  This makes sense given that one of the trial court's tasks in exercising its independent judgment was to determine whether the CSC prejudicially abused its discretion.  (Code Civ. Proc.,[5] § 1094.5, subd. (b).) Such an abuse of discretion would be established with evidence that the CSC "ha[d] not proceeded in the manner required by law, the order or decision [was] not supported by the findings, or the findings [were] not supported by the evidence." (*Ibid.*)  The trial court made clear its decision was based on the apparent disconnect between the CSC's findings and its conclusion that termination was warranted.  Thus, we conclude the City's appeal challenged the trial court's ruling that the CSC abused its discretion, and not just its conclusion that termination was inconsistent with the matrix and should be "off the table" on remand.  Accordingly, the City did not forfeit any part of its appeal.

## II.

### *The Trial Court's Finding that the CSC Abused its Discretion*

Although we do not find forfeiture, we agree the trial court's order contains two distinct conclusions.  First, it found the CSC abused its discretion by failing to reevaluate the level of discipline after declining to sustain two charges.  Second, it found it appropriate to take termination "off the table" on remand.  We review these two determinations separately.

---

4      To the extent the trial court's holding references a denial of fundamental due process, the City explains that it's only procedural due process challenge below related to the CSC's consideration of hearsay evidence, which is not at issue in this appeal.

5      Statutory references are to the Code of Civil Procedure unless otherwise specified.

Pivotal to our analysis of the trial court's first conclusion is clarifying the proper scope of review on appeal. Both the City and Torres argue we, like the trial court, should exercise our independent judgment in considering the CSC's order. We disagree.

A. *Legal Principles*

Section 1094.5 " 'is a codification of the procedure devised for reviewing the adjudications of . . . administrative agencies.' " (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816 (*Fukuda*).) It provides that the inquiry in such cases extends to questions of "whether the respondent [in this case, the CSC] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (§ 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

California courts have undertaken to protect "vested, fundamental rights," and "particularly the right to practice one's trade or profession" by carefully scrutinizing administrative decision affecting such rights. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 (*Bixby*).) A trial court does so by "not only examin[ing] the administrative record for errors of law but also exercis[ing] its independent judgment upon the evidence disclosed in a limited trial de novo." (*Ibid.*) " '[I]n weighing the evidence the courts can and should be assisted by the findings of the board. The findings come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence.' " (*Id.* at p. 139, quoting *Drummey v. State Board of Funeral Directors and Embalmers* (1939) 13 Cal.2d 75, 85; accord

15

*Fukuda, supra*, 20 Cal.4th at p. 817 [affirming the rule articulated in *Drummey* that "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence"].)

In such cases where "the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test." (*Fukuda, supra*, 20 Cal.4th at p. 824.) Thus, " '[O]ur function on appellate review is solely to decide whether credible, competent evidence supports that court's judgment.' " (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512.) In so doing, we "resolve all conflicts in evidence in favor of the prevailing party and indulge all legitimate inferences to uphold the judgment, if possible." (*Cruz v. City of Merced* (2023) 95 Cal.App.5th 453, 477.)

B. *Analysis*

The parties do not dispute that the administrative decision affected Torres's fundamental vested right and that the trial court, therefore, properly exercised its independent judgment in reviewing the CSC's findings and conclusion. In exercising its independent judgment, a trial court may find an administrative tribunal abused its discretion if "the order or decision is not supported by the findings." (§ 1094.5, subd. (b).) That is what occurred here. Although the trial court did not explain its reasoning at length, it appears to have concluded that the CSC's decision finding "that termination was appropriate, warranted, and justified" was not supported by the findings because the CSC only sustained three of the five findings and the evidence

16

supporting the findings relied on all five charges in recommending that Torres be terminated.  As the court stated, there was a disconnect between the CSC's findings and its conclusion that termination was warranted.

Our understanding of the trial court's conclusion is supported by the record.  In his writ briefing before the trial court, Torres argued that none of the officers who testified on behalf of the SDPD—Captain Hara, Assistant Chief Charlot, and Chief Nisleit—provided testimony as to what the appropriate discipline would be if one or more of the allegations were not proven.  He asserted that, "[w]ith the removal of the allegation related to the DA packet, the removal of the only allegation that involved a weapon, and the mitigation of the trespassing allegation, this was a much different case than when Captain Hara, Assistant Chief Charlot, and Chief Nisleit initially considered the appropriate level of discipline" and that "[The CSC] should, therefore, have reconsidered the level of discipline."  This argument and correct characterization of the evidence provide context for the trial court's agreement that the CSC failed to reevaluate the level of discipline given the significantly mitigated findings and, therefore, abused its discretion.

Our task then is to examine the record to determine whether the trial court's conclusion is supported by substantial evidence.  (*Fukuda, supra,* 20 Cal.4th at p. 824.)  Here, the CSC explained under the heading "Findings" why it found the SDPD had or had not met its burden as to each of the five alleged violations, but it did not address whether any individual violation, or the three sustained violations collectively, warranted termination.  Further, in its "Conclusion" section, the CSC provided no analysis whatsoever regarding the decision to uphold termination over some lesser discipline.  It did not discuss whether it found that the behavior supporting the conduct unbecoming and disobedience to laws charges fell under the matrix entry for

17

minor infractions (for which termination was only warranted following the second offense) or whether it found the behavior to be of the more severe variety. It also did not discuss harm to the public service or likelihood of recurrence as described in *Skelly, supra*, 15 Cal.3d 194,[6] with regard to the three sustained charges. Rather, it stated only that, "[b]ased on the foregoing findings of fact and sustained charges, the Hearing Officer finds that [Torres] was afforded due process and that termination was appropriate, warranted, and justified."

This is critical because, of the five alleged violations, the disciplinary matrix only provides for termination as a possible discipline for conduct unbecoming and failure to abide by laws. Indeed, when asked about the matrix, Captain Hara, who made the decision to recommend termination, testified only to having "consulted page 3 when dealing with Officer Jesse Torres's misconduct." Page 3 discusses the "Unbecoming Conduct Policy (DP 9.06)" and "Obedience to Laws Policy (DP 9.03)." Captain Hara clarified that although there are two entries on the matrix related to these sorts of conduct, the violation here was "not a minor [conduct unbecoming of an officer] type of offense for if it's parking violation or a traffic infraction. It is much more serious than that." The range of allowable discipline under the matrix for the more serious offenses involving "moral turpitude, theft or et cetera, on a first offense [is] suspension up through termination." However, when he was asked why "violation of Department Policy 9.06: Unbecoming conduct" supported termination, Captain Hara said the "totality of all of these

_____

[6] In *Skelly,* our high court explained that "the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.'" (*Skelly, supra*, 15 Cal.3d at p. 218.) "Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Ibid.*)

18

circumstances" supported termination.[7]  In upholding the recommendation, Chief Nisleit also looked at "the totality of this incident back in December of 2019."

As for the two sustained obedience to laws violations, Captain Hara generally explained his findings and how Torres had violated the policy. However, although he was asked by counsel why each violation justified termination or was included as part of his justification for termination, he did not cite to the disciplinary matrix or explain why termination was more appropriate than some lesser consequence.  Assistant Chief Charlot similarly explained in his letter following Torres's appeal why he agreed with each finding but then globally concurred that the termination recommendation "was based upon [Torres's] violation of Department Policy and Procedure, specifically, Department Policy 9.03 – Obedience to Laws, Policy 9.06 – Unbecoming Conduct, Policy 1.26 – Release of Criminal History, Arrest, and Crime Reports, and Other Police Records Policy, Department Procedure 1.26 – Access and Release of Criminal Records."  Likewise, Chief Nisleit once again explained that his decision to uphold the termination recommendation was based on "the totality of the incident."  When asked if his decision was based on Torres's conduct in violating department policy and procedure 1.26—a charge the CSC did not sustain—he said that was "[p]art of it."  He also answered yes when asked if his decision was "*also* based on

_____

7      Likewise, in the Advance Notice of Adverse Action – Termination letter, Captain Hara listed all the events from December 2019 in support of the unbecoming conduct charge.  He concluded that section by stating, "[y]our actions *throughout the whole evolution of events* showed a complete lack of good judgment on your part and demonstrate[ ] a clear lack of understanding for how your conduct brings the Department into disrepute as a whole." (Italics added.)

Department – violation of Department Policy 9.03: Obedience to laws" (italics added). Thus, the evidence did not address whether termination remained appropriate once two of the five charges were not sustained.

Finally, we note that the matrix allows the commanding officer to consider aggravating circumstances and previous discipline and determine that a higher level of discipline than what is called for in the guidelines is appropriate. Although Captain Hara and Chief Nisleit considered Torres's prior written warning to be an aggravating circumstance further justifying termination, there is no evidence either considered whether the prior written warning in conjunction with only the three sustained violations warranted termination. Accordingly, we conclude the trial court appropriately determined that insufficient findings supported the CSC's termination order. Therefore, substantial evidence supports the trial court's conclusion that remand is warranted.

The City presents two arguments that do not rely on the substantial evidence standard of review. First, it argues the trial court could not reevaluate the weight of witness testimony. It cites specifically to the court's reliance on Captain Del Toro's testimony that suspension would have been a more appropriate level of discipline. However, the City relies on *Wilson v. State Personnel Bd.* (1976) 58 Cal.App.3d 865, wherein the trial court was not exercising its independent judgment but rather reviewing for substantial evidence. (*Id.* at p. 880.) *Wilson*, thus, does not govern this situation where the trial court was tasked with exercising its independent judgment.

That is not to say the trial court could wholly ignore the CSC's findings. "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing

20

the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda, supra*, 20 Cal.4th at p. 817.) This presumption of correctness " 'has the effect of an admonition to the court.' " (*Id.* at p. 818.) "In other words, the presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Ibid.*; see also *Bixby, supra*, 4 Cal.3d at p. 143 ["the trial court not only examines the administrative record for errors of law but also exercises its independent judgment upon the evidence disclosed in a limited trial de novo"].) Our Supreme Court has made clear that "[t]his approach to the trial court's exercise of independent judgment long has been understood." (*Fukuda,* at p. 818.) Thus, under appropriate circumstances, the trial court *could* reevaluate the weight of witness testimony.

Second, the City presents the issue on appeal instead as the trial court improperly substituting its discretion for that of the CSC concerning the degree of punishment imposed. The City argues a court considering a writ petition challenging the severity of the penalty may not interfere with a penalty issued by an administrative agency merely because, in the court's evaluation of the circumstances, the penalty appears too harsh. To the contrary, they submit that where reasonable minds might differ as to the propriety of the penalty, the court is not free to substitute its discretion for that of the administrative agency. To aid in determining whether discipline is excessive, the City directs us to *Skelly*, which again provides that "the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' " (*Skelly, supra*, 15 Cal.3d at p. 218.)

The City cites to *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494 (*Schmitt*) as analogous. In *Schmitt*, a police officer was accused of child endangerment for swatting his son across the bottom with a belt, but no charges were ever filed. (*Id.* at pp. 496–497.) Also at issue in the case was a separate incident wherein Schmitt loaded his service revolver with blank, untested rounds that were not issued by the City of Rialto and then fired without warning at another officer during a training session. (*Id.* at p. 497.) After engaging in the required notification and hearing procedures, the chief of police recommended Schmitt be terminated from his employment because of these two incidents. (*Id.* at p. 498.) The Personnel Advisory Board of the City of Rialto conducted an evidentiary hearing and concluded Schmitt should be placed on leave without pay pending the outcome of the child endangerment investigation. (*Ibid.*) It further determined that Schmitt had violated a police department general order by discharging his weapon and recommended a 30-day suspension without pay. (*Ibid.*) The city council ultimately upheld both charges, concluding Schmitt should be placed in a diversion program in lieu of prosecution for the child endangerment charge. (*Ibid.*) Because the city council further found that Schmitt's discharge of his firearm violated a police department general order, it determined that termination was warranted. (*Ibid.*)

Schmitt filed a petition for writ of administrative mandamus and the superior court remanded the matter for additional findings of fact by the board as to whether the city had met its burden and as to the appropriate discipline. (*Schmitt, supra*, 164 Cal.App.3d at pp. 498–499.) On remand, the board decided the city had provided insufficient evidence to support the child endangerment charge. (*Id.* at p. 499.) It sustained the second charge and again recommended a 30-day suspension without pay. (*Ibid.*) The city

22

counsel adopted the board's findings regarding the child endangerment charge but concluded Schmitt's violation of the general order warranted termination. (*Ibid.*) Schmitt sought writ relief and the trial court, exercising its independent judgment, found that the city council had considered the child endangerment charge in reaching its penalty decision even though it was unsubstantiated, had improperly considered the city's potential financial liability if Schmitt was retained, and had not accorded proper weight to Schmitt's lack of a prior record of firearm misuse. (*Id.* at pp. 499–500.) The court further decided that even if Schmitt exercised extremely poor judgment in executing a deliberate act with a legitimate purpose, it did not reflect on his ability to perform law enforcement duties under pressure. (*Id.* at p. 500.)

On appeal, the appellate court concluded the trial court's reasoning regarding Schmitt's judgment was "unsound" and that the court's statement that "there was no relation between the gun-firing incident and [Schmitt's] ability to function as a police officer was clearly erroneous." (*Schmitt, supra*, 164 Cal.App.3d at p. 502.) The appellate court further determined that the record did not substantiate the trial court's conclusion that the city council was improperly influenced by the child endangerment charge. (*Id.* at pp. 502–503.) It found the city council did not act inappropriately in considering the city's legal liability because, under *Skelly*, the overriding consideration is potential or actual harm to the public service. (*Ibid.*, citing *Skelly, supra*, 15 Cal.3d at p. 218.) Having thus determined that the trial court's conclusions were unsupported, the appellate court considered whether the city council manifestly abused its discretion in terminating Schmitt. (*Schmitt*, at pp. 503–504.) It concluded the council had not and recalled the writ. (*Id.* at p. 504.)

We do not disagree with the *Schmitt* court, but we conclude the City's application of *Schmitt* to the instant facts is premature. In *Schmitt*, the appellate court reviewed the trial court's order and, although it did not expressly state as much, concluded its findings were not supported by substantial evidence in the record.[8] Because it found the trial court's grounds for disagreeing with the city council unsupported, it then evaluated whether the discipline the city council imposed based on supported findings constituted an abuse of discretion. Here, by contrast, we have reviewed the trial court's order for substantial evidence, and we agree with the trial court that the CSC's findings *do not* support its order. Accordingly, we agree remand is warranted.

If, following remand, the CSC again recommends termination and the trial court again disagrees, we would have to evaluate the circumstances at that time. If the trial court concludes that the CSC *did* proceed in the manner required by law, the order *was* supported by the findings, and the findings *were* supported by the evidence (see § 1094.5, subd. (b)), but the court simply finds that termination is too harsh a punishment, then we would agree with the City that we must review the CSC's disciplinary decision for abuse of discretion. A consideration of the *Skelly* factors would also be appropriate at that juncture. This is in keeping with *Barber v. State Personnel Board* (1976) 18 Cal.3d 395, upon which the *Schmitt* court relied. In *Barber*, our Supreme Court concluded the board's decision *was* supported by substantial evidence. (*Id.* at p. 404.) Only then did it go on to address

---

8      Earlier in the opinion, the *Schmitt* court did confirm its understanding that "[a]s to issues upon which the trial court has properly exercised its independent judgment, the appellate court reviews the findings of the trial court to determine whether they are supported by substantial evidence on the whole record." (*Schmitt, supra*, 164 Cal.App.3d at p. 501.)

Barber's argument the punishment imposed was so severe as to constitute an abuse of discretion. The court explained that "[t]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated." (*Ibid*., citing *Skelly, supra*, 15 Cal.3d at p. 217 and *Magit v. Board of Medical Examiners* (1961) 57 Cal.2d 74, 87.) It further elaborated that "[n]either an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber,* at p. 404, citing *Nightingale v. State Personnel Board* (1972) 7 Cal.3d 507, 515.)

To summarize, we conclude this analysis is premature. The record supports the trial court's decision that the CSC abused its discretion because evidence that the three sustained findings alone justified termination was lacking. As we will explain *post*, we do not, however, find support for the trial court's decision to take termination "off the table." Thus, the CSC will have full discretion on remand to determine the appropriate penalty.

III.

*The Trial Court's Order Barring Imposition of Termination on Remand*

The City argues the trial court's conclusion that termination is "inconsistent with the spirit of the Discipline Matrix" is not well founded. It contends the trial court's disagreement with the CSC's exercise of its discretion alone is insufficient to reverse the CSC's decision. We agree in part. Although we conclude remand is warranted, as explained *ante*, we do not find legal or factual support for the trial court's order taking termination "off the table" on remand.

The trial court opined that "the imposition of termination is inconsistent with the spirit of the Discipline Matrix" and noted that "[Captain] Del Toro had concerns about [Holly's] credibility and stated that

25

he believed that 'suspension would have been a more appropriate level of discipline.' " However, the order provides no authority for limiting the CSC's disciplinary discretion on remand, and we are not aware of any authorizing such a limitation under these circumstances. As we highlighted *ante*, the disciplinary matrix authorizes discipline up to termination for conduct unbecoming and disobedience to laws. The matrix also affords the commanding officer authority to impose discipline greater than that called for in the matrix based on aggravating circumstances and previous discipline. Thus, although Captain Hara, Assistant Chief Charlot, and Chief Nisleit all based their termination recommendations on the totality of the conduct, they could conclude under the express language of the matrix that the three sustained charges, alone or in combination with Torres's prior discipline, justified termination.[9]

The trial court also did not analyze the factors set forth in *Skelly* to justify a finding that termination was too harsh a penalty. (See *Skelly, supra*, 15 Cal.3d at p. 218 [taking into consideration whether the employee's conduct caused harm to the public service and was likely to recur in addition

---

[9]    We decline to simply infer at this juncture that the CSC found termination appropriate based only on the fact that it was still technically authorized by the matrix for the sustained charges. Neither the parties nor the CSC provided any analysis as to whether the subset of sustained findings justified termination. The CSC did not explain which box on the matrix it felt applied to the sustained charges, which is pertinent since only one authorized termination for the first offense. The fact that the City felt compelled in its opening brief to argue that Torres's criminal trespass should fall into the more serious category supports the conclusion that this was not an established finding by the CSC. Ultimately, given the gravity of the findings that were not sustained and their seeming importance to the recommendations made by the commanding officers, to infer a basis without any analysis from the CSC seems too great an inferential leap.

26

to factoring in the circumstances surrounding the misconduct].)  As such, the court provided no potential justifications for us to review.  Thus, although we offer no opinion as to whether termination is appropriate under these circumstances, we conclude the trial court abused its discretion by taking termination "off the table."

## DISPOSITION

The order is reversed to the extent it prohibits the CSC from considering the full panoply of discipline, including termination, upon remand.  The trial court is directed to amend the remand order such that the CSC has full discretion to implement any level of discipline supported by the evidence on remand, up to and including termination.  The order is otherwise affirmed.

The City is entitled to its costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


CASTILLO, J.

27